Keith YOUNG, Individually and as Superintendent of Board of Education, Adair County, Appellants,

v.

Scott HAMMOND, Michael Akin, Janet Hutcheson, John Peck, Candace Stockton, and Debra Wimmer, Individually and as Members of Adair County High School Council, Appellees,

and

Ronald Back, in His Official Capacity as Superintendent of Russell Independent Schools, and Board of Education of Russell Independent School District, Appellants,

v.

Mary Robinson, Appellee.

No. 2003–SC–0397–I, 2003–SC–0462–DG.

Supreme Court of Kentucky.

April 22, 2004.

Rehearing Denied Aug. 26, 2004.

Michael A. Owsley, W. Cravens Priest III, English, Lucas, Priest & Owsley, Bowling Green, Counsel for Appellants.

Jeffrey S. Walther, Beth Anna Bowell, Walther, Roark, Gay & Todd, PLC, Lexington, Counsel for Appellees.

J. Stephen Kirby, Kentucky School Boards Association, Frankfort, Counsel for Amicus Curiae, Kentucky School Boards Association.

Bridget S. Brown, Kentucky Education Association, Frankfort, cause no. 2003-SC-0397-I, Joellen S. McComb, Mary Wheeler Ruble Brooks, McComb, Fields, Ruble & Mullins, Lexington, cause no. 2003-SC-0462-DG, Counsel for Amicus Curiae, Kentucky Education Association.

William H. McCann, William B. Owsley, Wyatt, Tarrant & Combs, Lexington, Ruth H. Webb, Harrodsburg, Counsel for Amicus Curiae, the Prichard Committee for Academic Excellence.

Vernon Wayne Young, General Counsel, Kentucky Association of School Administrators, Frankfort, Counsel for Amicus Curiae, Kentucky Association of School Administrators.

Dennis Franklin Janes, Segal, Stewart, Cutler, Lindsay, Janes & Berry, Louisville, Counsel for Amicus Curiae, Jefferson County Teachers Association.

Opinion of the Court by Justice JOHNSTONE.

The central issue in each of the captioned cases is whether KRS 160.345(2)(h) requires a site based decision making council to select a school principal from among those applicants whom the local superintendent recommends. Because the primary issue is common to both cases, we will address it in a single opinion. We will also address the issue of whether the gender discrimination claim asserted in *Back v. Robinson* is barred by the election of remedies doctrine.

The Court of Appeals, sitting *en banc*, heard the issue concerning the construction of KRS 160.345(2)(h) in *Robinson v. Back*, Ky.App., —— S.W.3d ——, 2001–CA–001933–MR (May 16, 2003). In an 8–5 decision, the Court reversed the summary judgment of the Greenup Circuit Court and concluded that the statute requires the local superintendent to forward all applications meeting statutory standards to the school council upon its request, regardless of whether the candidate bears the superintendent's recommendation. A three-member panel considered the dismissal of the appellee's gender discrimination claim in *Robinson v. Back*, determining that the doctrine of remedies did not bar the claim and, therefore, summary judgment was improper. We affirm the Court of Appeals on both issues.

In *Young v. Hammond*, the movant sought interlocutory relief before the Court of Appeals, claiming that the Adair Circuit Court abused its discretion in granting two temporary injunctions. Incorporating by reference its *en banc* opinion in *Robinson v. Back*, the Court of Appeals in *Young v. Hammond* denied the motion for interlocutory relief. We affirm.

## I. *Young v. Hammond*

The movant, Keith Young (Young), is Superintendent of the Adair County School District. On May 3, 2002, Young demoted Michael Akin (Akin) from his position as principal of Adair County High School, citing inadequate performance. Young posted the position as vacant, received nine applications, and forwarded three applications to the Adair County High School's site based decision making council (the Adair Council). The remaining six applications, including Akin's, were not forwarded to the Adair Council because Young did not recommend these applicants.

The Adair Council reviewed the three recommended applications, rejected them, and subsequently requested that Young forward all remaining applications for consideration. Young refused, relying on KRS 160.345(2)(h) that he was not required to forward applications that he did not recommend. The 2002–2003 school year commenced, and Young appointed one of the three recommended applicants as the interim principal. The Adair Council filed a complaint and motion for a temporary injunction against Young. The motion sought to compel Young to forward all nine applications to the Adair Council for consideration. Akin filed a simultaneous complaint and a motion.

The Adair Circuit Court entered its joint findings of fact, conclusions of law, and order on August 27, granting the motions for temporary injunctions against Young. Young eventually did forward the remain-

ing applications to the Adair Council, which made the recommendation that Young re-hire Akin as the principal of Adair High School. Young refused to complete the hiring of Akin, and the Adair Council and Akin sought another temporary injunction against Young that would order him to hire Akin. Arguing that the Adair Circuit Court abused its discretion in granting the two temporary injunctions, Young sought interlocutory relief from the Court of Appeals. Incorporating by reference its opinion in *Robinson v. Back*, the Court of Appeals denied Young's motion, determining that KRS 160.345(2)(h) does not require a school's site based decision making council to fill a vacancy in a principalship only from those applicants bearing the local superintendent's recommendation. Young now appeals to this Court.

## II. *Back v. Robinson*

The appellant, Ronald Back (Back), is the Superintendent of the Russell Independent School District. In 1998, a vacancy occurred in the principalship of Russell High School. The appellee, Mary Robinson (Robinson), then the assistant principal of Russell High School, submitted her application for consideration. Pursuant to KRS 160.345(2)(h), Back forwarded to Russell High School's site based decision making council (the Russell Council) four applications for the vacant principal position. Robinson's application was not forwarded.

The Russell Council then requested additional applications from Back. Stating that he did not recommend any of the remaining applicants and was therefore not required to provide additional candidates, Back did not forward any additional resumes to the Russell Council. Consequently, Robinson's application was not

considered and a principal was selected from among the four applications originally provided to the Russell Council. Both parties agree, however, that Robinson was statutorily qualified for the position.

Robinson sued Back on three grounds: (1) that Back acted in violation of KRS 160.345(2)(h) when he refused to forward her application to the Russell Council; (2) that Back had discriminated against her on the basis of gender; and (3) that she had not been compensated for work performed in violation of KRS 337.020. The Greenup Circuit Court granted summary judgment dismissing all three claims. Robinson appealed. The Court of Appeals affirmed the dismissal of Robinson's compensation claim, but reversed the dismissal of her gender discrimination claim. Sitting *en banc* as to the issue concerning KRS 160.345(2)(h), the Court of Appeals reversed the trial court's decision, holding that KRS 160.345(2)(h) requires a local superintendent to forward all available and statutorily qualified applicants to the site based decision-making council, including those whom the superintendent does not recommend. Back now seeks review by this Court of the Court of Appeals' decision with respect to its reinstatement of Robinson's gender discrimination claim and its interpretation of KRS 160.345(2)(h).

## III. Interpretation of KRS 160.345(2)(h)

The primary question before us in both matters is the proper interpretation of certain portions of KRS 160.345(2)(h), which are highlighted below:

> From a list of applicants submitted by the local superintendent, the principal at the participating school shall select personnel to fill vacancies, after consultation with the school council, consistent

with subsection (2)(i)10 of this section. The superintendent may forward to the school council the names of qualified applicants who have pending certification from the Education Professional Standards Board based on recent completion of preparation requirements, out-of-state preparation, or alternative routes to certification pursuant to KRS 161.028 and 161.048. Requests for transfer shall conform to any employer-employee bargained contract which is in effect. If the vacancy to be filled is the position of principal, the school council shall select the new principal from among those persons recommended by the local superintendent. When a vacancy in the school principalship occurs, the school council shall receive training in recruitment and interviewing techniques prior to carrying out the process of selecting a principal. The council shall select the trainer to deliver the training. Personnel decisions made at the school level under the authority of this subsection shall be binding on the superintendent who completes the hiring process. Applicants subsequently employed shall provide evidence that they are certified prior to assuming the duties of a position in accordance with KRS 161.020. The superintendent shall provide additional applicants upon request when qualified applicants are available.

(Emphasis added).

Specifically, we must determine the meaning of the word "qualified" as it is used in the final sentence of the statute. Young and Back argue that the Court of Appeals erred in interpreting the term "qualified" to mean "meeting statutory requirements." As read by Young and Back, the last sentence of KRS 160.345(2)(h) requires the superintendent to forward additional applications to the Council only when additional, *recommended* applications exist. To allow the Court of Appeals' opinion to stand would mean that school councils might hire principals that are not recommended by the local superintendent, as was the case with Young. Young and Back assert that this interpretation removes the local superintendent from the hiring process, and creates an environment in which the local superintendent is expected to closely manage an employee whom he or she did not necessarily recommend for employment.

In their respective responses, Akin and Robinson urge this Court to affirm the Court of Appeals' decision. Akin and Robinson point to the use of the word "shall" in the last sentence of KRS 160.345(2)(h) to support the interpretation that the superintendent *must* forward all remaining applicants to the school based decision making council, regardless of whether the local superintendent recommends those applicants. This reading also requires that the term "qualified," as used in the last sentence of the statute, mean simply "meeting statutory requirements." Akin and Robinson rely heavily on the Kentucky Educational Reform Act's objectives of decentralization and shared decision-making authority to support this interpretation. According to Akin and Robinson, KRS 160.345(2)(h) sets up a two-tiered process whereby the superintendent initially recommends one or more candidates to the school based council for its consideration in the selection of a principal; it is only after the initial candidates have been selected and rejected that the superintendent then must forward all remaining applicants who meet the statutory requirements for the position.

■ We have considered the positions of both parties, as well as the numerous

amicus curiae briefs filed in these matters, and conclude that the Court of Appeals' interpretation of KRS 160.345(2)(h) is correct.

In deciding the issue of whether KRS 160.345(2)(h) requires the local superintendent to provide to the school council additional applications when qualified applications are available, even though such applicants may not carry the recommendation of the superintendent, it is imperative to revisit the objectives and goals of the Kentucky Education Reform Act (KERA), and the background against which the reform act was passed. The General Assembly passed KERA in response to this Court's decision in *Rose v. Council for Better Education, Inc.,*[1] in which we determined that the General Assembly had not fully complied with its constitutional duty to provide "an efficient system of common schools throughout the state".[2] Among other contributing factors, the Court in *Rose* concluded that the dire situation in Kentucky's public schools was due largely to "improper nepotism" and "favoritism."[3] Moreover, in delineating the characteristics of a system of education that would meet the constitutional mandate of efficiency, this Court listed as a *minimum* requirement a common school system that operates with "no waste, no duplication, no mismanagement, and with no political influence."[4]

■ Consequently, in constructing KERA, a central and fundamental goal of the reform act was to decentralize school management, to remove opportunities for nepotism and political influence, and to disperse decision-making authority among several interested parties. Especially important to consideration of the case *sub judice* are the underlying theories behind the bold and ambitious implementation of site based decision making councils. These councils were created in direct response to widely documented instances of mismanagement that most agreed were incubated in, if not caused by, an overly centralized system of school governance in which vast decision-making authority rested in the hands of a few key players.[5] Decentralization of school management, however, allows for a higher level of accountability, in that it is easier to hold a particular school responsible for poor performance when school governance issues are actually being decided at the school, rather than at the county or state level.[6] The language of KERA itself reflects the faith that was placed in decentralization as a vehicle for massive educational reform: "The General Assembly recognizes that public education involves shared responsibilities. State government, local communities, parents, students, and school employees must work together to create an efficient public school system." KRS 158.645. Likewise, this Court has continually recognized decentralization as a cornerstone of educational reform in this Commonwealth.

Pervasive throughout all pertinent provisions, when considered as a whole statu-

1. Ky., 790 S.W.2d 186 (1989)

2. Ky. Const. Sec. 183

3. *Id.* at 193.

4. *Id.* at 213.

5. *See generally,* Molly A. Hunter, *All Eyes Forward: Public Engagement and Educational* *Reform in Kentucky,* 28 J.L. & Educ. 485 (1999).

6. William H. Clune, *Educational Adequacy: A Theory and Its Remedies,* 28 U. Mich. J.L. Reform 481, 488 (1995) (discussing decentralization of authority in school governance as a method to increase accountability).

tory framework, is one important theme. The essential strategic point of KERA is the decentralization of decision making authority so as to involve all participants in the school system, affording each the opportunity to contribute actively to the educational process.[7]

Bearing in mind the importance of decentralization to KERA, we turn to the interpretation of KRS 160.345(2)(h). We conclude that the word "qualified" as used in KRS 160.345(2)(h) must be interpreted to mean "meeting statutory requirements." To hold that a school council may only select a principal from among those applicants recommended by the local superintendent would undermine the primary goal of decentralization of authority and would be at odds with KERA's stated goal of shared decision-making authority.

A construction of KRS 160.345(2)(h) that would allow the local superintendent to provide the school councils with only those applications whom he or she recommends would run counter to these goals. Such a reading of the term "qualified" would essentially strip the school council of any actual authority, for the superintendent could simply choose to recommend only the applicant whom he or she personally selects. If the school council disapproved of the superintendent's choice, the superintendent could simply state that no other "qualified"—i.e. recommended—candidates exist and the school council would have no option but to effectuate the superintendent's choice for principal. More importantly, such a framework would remove virtually all accountability of the superintendent, who would essentially be authorized to subjectively choose school principals on the basis of any criteria, even personal or political. We do not believe the legislature intended to grant such singular and unfettered authority in the hands of one person.

■ Rather, KRS 160.345(2)(h) must be read so as to require the superintendent to forward to the school council all applications meeting the minimum statutory requirements for the position of principal. Interpreting the term "qualified" in that manner sets up an effective system of checks and balances that is in tune with KERA's goal of shared decision making. The school council considers first the superintendent's recommended candidates, and it should be noted that the superintendent is not limited in the number of candidates whom he or she may recommend. It is only after the council has reviewed and rejected these candidates that the council may then request all remaining qualified candidates. By this process, the superintendent has a voice in the selection of school principals. It should also be noted that the authority granted to the school council in selecting new principals is tempered by the restriction that the school council is not permitted to make recommendations as to transfers or dismissals; in the case of the position of principal, this power remains in the hands of the local superintendent. KRS 160.345(2)(f).

■ However, we believe that the legislature intended for the school councils to have ultimate authority in the selection of school principals. Reviewing the entirety of KRS 160.345, it is plainly evident that the General Assembly intended for these councils to have a real voice in school governance and to be vested with legitimate authority, not to be a body that merely makes recommendations that the local superintendent or school board may

---

7.  *Bd. of Education of Boone County v. Bushee*,     Ky., 889 S.W.2d 809, 812 (1994).

or may not adopt. Indeed, other portions of KRS 160.345 vest the school council with the authority to make such fundamental decisions as selection of the school's curriculum and instructional materials, determination of methods of school assessment, and management of instructional practices within the school. KRS 160.345(2)(i). Therefore, it is not illogical that the General Assembly also intended for the school council to hold the ultimate authority when it comes to choosing the leader of the school.

Furthermore, a review of the language of KRS 160.345(2)(h) itself supports the conclusion that the school council, not the superintendent, makes the final decision in the selection of school principals. The statute requires that the "school council shall receive training in recruitment and interviewing techniques prior to carrying out the process of selecting a principal" and that the school council shall select the trainer to deliver such instruction. If the school council were only permitted to select the principal from among the candidates recommended by the local superintendent, then such training would be superfluous and it would be the superintendent receiving instruction. Rather, we believe that the General Assembly wisely included a requirement that the school council receive training in hiring techniques because it envisioned the school council as playing the key role in the selection of new principals.

We believe that such a reading of KRS 160.345(2)(h) ultimately enhances the relationship between the school council and the local superintendent by creating a meaningful dialogue in the selection of school principals. The superintendent reviews the applications before anyone else and, after removing those applicants not meeting state and local requirements, the superintendent may then apply his or her subjective criteria before making a final recommendation. Aware that the school council is under no obligation to select a recommended applicant, the superintendent is encouraged to base his or her recommendations on sound, legitimate criteria and is required to explain and justify such recommendations in an open and frank discussion. Moreover, the superintendent is less likely to recommend a clearly unsuitable, though favored, applicant. Even in circumstances where the school council disagrees with the superintendent and requests additional applications, the superintendent is still free to share his or her analysis of the remaining candidates and attempt to persuade the school council towards the recommended applicants. Where the recommendation is rooted in the best interests of the school, the capable superintendent should not have difficulty persuading the school council to accept his or her recommendation.

We conclude that the only reading of KRS 160.345(2)(h) that is in line with KERA's stated goals of decentralization and shared decision-making authority is one by which the school council holds ultimate authority in selecting the school's principal. We read "qualified," as used in the last sentence of KRS 160.345(2)(h), to mean that, upon the request of the school council, the local superintendent is required to forward *all* remaining applications that meet statutory requirements for the position. The holding of the Court of Appeals with respect to this issue in *Back v. Robinson,* and the holding of the Court of Appeals in *Young v. Hammond* are, therefore, affirmed.

## IV. Gender Discrimination

■ The Greenup Circuit Court granted summary judgment in favor of Back and

dismissed Robinson's claim of gender discrimination, holding that the claim was barred by the doctrine of election of remedies. Robinson claimed that she was discriminated against on the basis of her gender where her application for Russell High School principal was not considered, even though she was statutorily qualified for the position. Robinson had previously filed a claim with the Equal Employment Opportunity Commission (the EEOC), prior to filing her claim in the present matter. The Greenup Circuit Court concluded that Robinson's present claim was barred by the doctrine of election of remedies. We disagree and adopt the analysis of the Court of Appeals with regard to this issue, as set forth below:

> The doctrine of election of remedies provides that when a person has at her disposal two modes of redress that are contradictory and inconsistent with each other, her deliberate and settled choice and pursuit of one will preclude her later choice and pursuit of the other. *Wilson v. Lowe's Home Center*, Ky.App., 75 S.W.3d 229 (2001). The trial court relied on *Vaezkoroni v. Domino's Pizza, Inc.*, Ky., 914 S.W.2d 341 (1995), as authority for its finding that Robinson's action in filing a claim with the Equal Employment Opportunity Commission (hereinafter EEOC) in 1998 precluded her from bringing this action. The trial court stated that the "filing of an administrative complaint bars such court action under the doctrine of election of remedies."
>
> While it is true that *Vaezkoroni* established a standard in the Commonwealth that provides both administrative and judicial sources of relief for claims arising under the Kentucky Civil Rights

Act, the facts of *Vaezkoroni* and the statute indicate that this standard applies only to the Kentucky Human Rights Commission and local commissions. On appeal, the appellees argue that the case of *Founder v. Cabinet for Human Resources*, Ky.App. 23 S.W.3d 221 (1999), is controlling on this issue. This panel is of the opinion that *Founder* should be viewed narrowly. Furthermore, the opinion of *Grego v. Meijer, Inc.*, 187 F.Supp.2d 689 (W.D.Ky.2001), and this Court's more recent opinion of *Wilson, supra*, are more persuasive.

> The trial court's reliance on the doctrine of election of remedies in this case was misplaced. Robinson filed a charge of discrimination with the EEOC. After filing the charge, she was notified by the EEOC that her file was being closed and she was informed of her right to sue. It is not alleged that Robinson ever filed a complaint with any agency of the Commonwealth other than the instant circuit court action. As such, the trial court's reliance on the doctrine of election of remedies to grant summary judgment was inappropriate.

*Robinson v. Back*, Ky.App., —— S.W.3d ——, ——–——, 2001–CA–1933–MR at 8–9 (rendered May 16, 2003).

We also agree with the Court of Appeals that Robinson has established a prima facie case for sex discrimination, and therefore summary judgment was not appropriate. The trial court correctly applied the analysis used in *McDonnell Douglas Corp. v. Green*,[8] which sets forth a four-prong test for establishing a prima facie case for sex discrimination: (1) that the plaintiff was a member of a protected class, (2) that the plaintiff was qualified for

8. 411 U.S. 792, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)

the job, (3) that the plaintiff did not receive the job, and (4) that the position remained open and the employer sought other applicants. *Id.* The trial court concluded that Robinson did not satisfy the second prong of this test. In its consideration of the KRS 160.345(2)(h) matter, the trial court determined that a candidate is "qualified" for the position of school principal only when that applicant meets statutory requirements and bears the superintendent's recommendation. The trial court then applied that definition of "qualified" to its analysis under the *McDonnell* test; that is, because the trial court believed Robinson was not "qualified" within the meaning of KRS 160.345(2)(h), she was therefore not "qualified" for purposes of the *McDonnell* test. We have interpreted KRS 160.345(2)(h) otherwise. Having concluded that KRS 160.345(2)(h) does not require a candidate to bear the recommendation of the local superintendent in order to be qualified for the position of school principal, Robinson has therefore met the four-prong test to establish a prima facie case of sex discrimination.

## V. Conclusion

In summary, we conclude that, in order for the objectives and principles of KERA as envisioned by the Kentucky General Assembly to be satisfied, KRS 160.345(2)(h) must be read to require the superintendent to provide to the school council all statutorily qualified applications upon its request, regardless of the superintendent's personal recommendations. Therefore, in *Young v. Hammond,* we agree with the Court of Appeals that the Adair Circuit Court did not abuse its discretion in granting temporary injunctions against Young, and hereby affirm the Court of Appeals' opinion in that matter. Similarly, in *Back v. Robinson,* we con-

clude that the Greenup Circuit Court did not err in granting summary judgment in favor of Robinson as to the violation of KRS 160.345(2)(h), and we affirm the Court of Appeals' opinion regarding this issue. Finally, in light of our construction of KRS 160.345(2)(h), we conclude that Robinson did establish a prima facie case of gender discrimination, which was not barred by the election of remedies. Thus, we affirm the Court of Appeals' holding that the trial court erred in granting summary judgment as to that claim.

LAMBERT, C.J.; GRAVES, STUMBO, and WINTERSHEIMER, JJ., concur.

COOPER, J., dissents by separate opinion, with KELLER, J., joining that dissent.

Dissenting opinion by Justice COOPER.

KRS 160.345(2)(h) defines the respective roles that the superintendent, the principal, and the school based decision-making council ("school council") play in filling employee vacancies at a public (common) school. I will discuss each provision of the statute and its legislative history at length, *infra.* To summarize, although only the superintendent is authorized to hire a school employee, KRS 160.370; KRS 160.380(2)(a), hiring decisions are shared with the principal and the school council. If the vacancy is other than that of principal, KRS 160.345(2)(h) provides that the principal *shall* select "*[f]rom a list of applicants submitted by* " the superintendent and after "consultation with the school council." If the vacancy is the position of principal, the school council *shall* choose the new principal "*from among those persons recommended by* " the superintendent. (Emphasis added.) The logic behind this statutory scheme is obvious: the

superintendent supervises and evaluates the principal; the principal supervises and evaluates all teachers and other school employees. KRS 160.370 (superintendent has general supervision of conduct of schools); KRS 160.345(2)(c)(1) (principal is primary administrator of school); KRS 156.557(3)(c)(1), (2); 704 KAR 3:345 § 4(2)(a) (immediate supervisor is primary evaluator of certified employee below level of superintendent). The superintendent is also the only school district employee authorized to transfer, dismiss, suspend, reinstate, or demote an employee of the school district, KRS 160.390(1); obviously, the superintendent must have input in the hiring of all school personnel. With respect to non-principal vacancies, the superintendent's input is by providing the list of applicants from which the principal must select the new employee. With respect to a principal vacancy, the superintendent's input is by recommending those persons from whom the school council must select the new principal.

At issue in these two cases is the last sentence of KRS 160.345(2)(h), *viz:* "The superintendent shall provide additional applicants upon request when *qualified* applicants are available." (Emphasis added.) The logical interpretation of "qualified" when the vacancy is the position of principal and, thus, the person selected must have been "recommended by the superintendent," is that "qualified" must inclusively mean "recommended by the superintendent." Eschewing logic, however, the majority opinion holds that "qualified" means "meeting minimum statutory requirements," *ante,* at —— (slip op. at 9), conveniently forgetting that one of those statutory requirements is that the person selected must have been "recommended by the superintendent." Thus, the majority opinion concludes that the school coun-

cil can choose, over the superintendent's objection, any applicant with a non-disqualifying criminal record and a certification issued by the Education Professional Standards Board. The facts in *Young v. Hammonds,* discussed *infra,* provide a textbook example of the potential abuse unleashed by that conclusion.

Justice Leibson was fond of citing Judge Jerome Frank's reference in *Dincher v. Marlin Firearms Co.,* 198 F.2d 821 (2d Cir.1952), to an imaginary "topsy-turvy land." *Id.* at 823 (Frank, J., dissenting). *See Michels v. Sklavos,* Ky., 869 S.W.2d 728, 730-31 (1994) ("a one-way ticket to 'Topsy–Turvy Land' "); *Perkins v. Northeastern Log Homes,* Ky., 808 S.W.2d 809, 817 (1991); *Tabler v. Wallace,* Ky., 704 S.W.2d 179, 184 (1985).

> Topsy-turvy * 1. in an inverted posture: with the top or head downward: upside down * 2. in a state where proper or normal places, values, standards, objects, or facts are reversed.

*Webster's Third New International Dictionary of the English Language Unabridged* 2411 (1993). Today's majority opinion converts Judge Frank's aphorism from imaginary to real and converts our carefully crafted system of common schools into a "topsy-turvy land" where employees choose their own supervisors without input from and over the objections of their employers, and may even choose a person whom the employer has previously removed from the same position because of incompetence, *i.e.,* a place where the tail clearly wags the dog. It is also a place where a judicial system will enjoin the employer from removing the same incompetent supervisor in the future even though the employer is the only person legally authorized to do so. KRS 160.370; KRS 160.390(1).

A school council consists of three teachers elected by their fellow faculty members, two parents elected by parents of preregistered students, and, virtually always, the school principal (who, of course, is unavailable to vote when the vacancy to be filled is the position of principal itself). KRS 160.345(2)(a), (b)(1). Thus, the teacher members of a school council possess the majority votes necessary to choose their new supervisor (principal). No doubt, that is why both the Kentucky Education Association and the Jefferson County Teacher's Association submitted amicus briefs supporting the position adopted by today's majority opinion. Significantly, however, the Kentucky Association of School Councils (KASC) has not filed an amicus brief. In fact, Susan Perkins Weston, the executive director of the KASC, was recently quoted as stating with respect to the previous statutory interpretation now being discarded:

> We were comfortable with that (selection process).... For a school and a principal to succeed, there must be a strong commitment from the central office. They work together.

Mark Cooper,[1] *Hiring, costs, health top school issues; Principal selection is in dispute,* Messenger–Inquirer, Jan. 4, 2004, at 1C.

Even in "topsy-turvy land," one would hope that teachers, being teachers, would not abuse the power now bestowed upon them by this Court for the purpose of usurping a superintendent's exclusive authority over school personnel decisions. KRS 160.370 ("[The superintendent] shall be responsible for the hiring and dismissal of all personnel in the district."); KRS 160.380(2)(a) ("All appointments, pro-motions, and transfers of principals, supervisors, teachers, and other public school employees shall be made only by the superintendent of schools ...."); KRS 160.390(1) ("[The superintendent] shall be responsible for all personnel actions including hiring, assignments, transfer, dismissal, suspension, reinstatement, promotion, and demotion...."). Unfortunately, such abuse is precisely what occurred in *Young v. Hammond.*

## I. *YOUNG v. HAMMOND.*

Michael Akin had been principal of Adair County High School since 1999. On May 3, 2002, Keith Young, superintendent of Adair County schools, gave Akin written notification of his demotion to a teacher position, as authorized in KRS 161.765(1), because he had failed to meet any of the standards of performance used in evaluating school principals within the Adair County school district. *See* KRS 156.557(2); 704 KAR 3:345 § 5. In addition to Young's written evaluation, the record includes affidavits from parents, teachers, the school's food service director, and the school's guidance counselor attesting to Akin's policy of benign neglect. As is customary, Young posted the principal vacancy on the Kentucky Department of Education's website.

Akin appealed his demotion to the local evaluation appeals panel, consisting of one central office administrator and two teachers selected by the faculty. KRS 156.557(6); 704 KAR 3:345 §§ 7–8. Following an evidentiary hearing where Akin was represented by counsel, the panel revised the evaluation in two respects but still found his other deficiencies sufficient to warrant the demotion. Akin did not

---

1. No relation to the author of this opinion.

seek an additional appeal to the State Evaluation Appeals Panel. 704 KAR 3:345 § 9. Instead, he submitted a written application to fill the vacancy in his former position as principal of Adair County High School. (!) Young "discarded" Akin's application because he would never recommend that the school council choose for its new principal the very person he had just demoted from that same position on grounds of incompetence.

Eight other persons also applied for the vacancy. On June 18, 2002, Young delivered to the school council the applications of the three applicants that he recommended for the position of principal. The school council met that evening to examine the applications. By written communication dated June 18, 2002(!!), the council requested "all applications for Principal, *including Mr. Mike Akin's.*" (Emphasis added.) Obviously, the skids were greased. On June 21, 2002, Young sent a memo to the council stating that there were no other applicants that he could recommend. (It was stipulated that all nine applicants, including Akin, possessed a principal's certification and no disqualifying criminal record.) On June 24, 2002, the council sent another written communication to Young requesting "all applications *including that of Mr. Michael Akin* for the position of principal." (Emphasis added.) At this point, the council had not interviewed any of the three applicants recommended by Young. The same communication also requested that the position be re-advertised. Since the vacancy was still posted on the Department of Education website, this request required no responsive action. No further applications were received.

On July 5, 2002, the council interviewed the three applicants that Young had rec-

ommended. One teacher member of the council testified that she rejected one recommended applicant who "looked good on paper" because he was "too aggressive." When asked her opinion of Akin, the same witness admitted that he was "probably too laid back." On July 8, 2002, the council members sent Young another written communication, expressing for the first time their dissatisfaction with his recommended applicants and requesting that the position be advertised in statewide newspapers. Young complied by advertising the vacancy for five days in both the Louisville Courier–Journal and the Lexington Herald–Leader. He received no additional applications.

School was scheduled to begin on August 6, 2002. On July 8, 2002, apparently pursuant to KRS 160.380(2)(c), Young appointed one of the recommended applicants, the principal of an Adair County elementary school, as interim principal of the high school. The school council members responded by filing an action in the Adair Circuit Court for an injunction requiring Young to furnish them with all of the applications he had received for the principal vacancy. Akin filed a separate suit on the same day demanding compensatory and punitive damages for wrongful discharge and also asked the court to order Young to forward his application to the council. Following a hearing on August 24, 2002, the Adair Circuit Court entered an order concluding that "[i]n the process of hiring a principal, the role of the superintendent is non-discretionary and ministerial," and requiring Young to submit all applications to the school council. Young forwarded the additional five applications still in his possession to the council with a note explaining that he had "discarded" Akin's application. Not surprisingly, Akin delivered a new application to Young's of-

fice the next day. Young forwarded it to the school council. Shortly thereafter, the council members notified Young that they had chosen Akin as the new principal. When Young refused to complete the hiring process, the council and Akin returned to the Adair Circuit Court and obtained a temporary injunction requiring Young to hire Akin, subject to a contempt citation, and enjoining Young from demoting or terminating Akin during the pendency of the action. Young then sought interlocutory relief pursuant to CR 65.07 and CR 65.09.

## II. LEGISLATIVE HISTORY.

KRS 160.345(2)(h) was enacted as part of the Kentucky Education Reform Act (KERA), 1990 Ky. Acts, ch. 476, pt. I, § 14(2)(i), and has been amended by the General Assembly on four occasions. Like many statutes that have undergone multiple amendments, what started as a reasonably brief and simple paragraph has evolved into a lengthy paragraph that describes separate procedures for hiring two categories of employees. For ease of understanding, I have divided the statute into three paragraphs, enclosing in brackets the language added by subsequent amendments, which are numerically designated, indicating by strike through any language deleted by an amendment (only one word), and emphasizing the language pertinent to the present litigation. The amendments will be discussed, *infra*, in the order of their numerical designation.

From a list of applicants ~~recommended~~ [submitted] [1] by the local superintendent, *the principal* at the participating school *shall select* personnel to fill vacancies, *after consultation with* the school council, [consistent with subsection (2)(i)10 of this section].[2] [The su-

perintendent may forward to the school council the names of *qualified applicants* who have *pending certification* from the Education Professional Standards Board based on recent completion of preparation requirements, out-of-state preparation, or alternative routes to certification pursuant to KRS 161.028 and 161.048.] [4] Requests for transfer shall conform to any employer-employee bargained contract which is in effect.

*If the vacancy to be filled is the position of principal, the school council shall select the new principal from among those persons recommended by the local superintendent.* [When a vacancy in the school principalship occurs, the school council shall receive training in recruitment and interviewing techniques prior to carrying out the process of selecting a principal. The council shall select the trainer to deliver the training.] [3]

Personnel decisions made at the school level under the authority of this subsection shall be binding on the superintendent who completes the hiring process. [Applicants subsequently employed shall provide evidence that they are *certified* prior to assuming the duties of a position in accordance with KRS 161.020.] [4] The superintendent shall provide additional applicants upon request [when *qualified* applicants are available].[1]

As thus parsed, the first paragraph applies to the hiring of all school employees except a school principal; the second paragraph applies to the hiring of a principal; and the third paragraph applies to both. The principal alone has authority to select a non-principal employee, subject to the requirements that the person hired be from "a list of applicants submitted by the

local superintendent" and "after consultation with the school council." The school council has authority to select the new principal, subject to the requirement that the person selected be among those "persons recommended by" the superintendent.

As originally enacted, the statute required that all newly hired school employees be "recommended by" the superintendent. It made no reference to "certified" or "qualified" applicants and contained no provision for training school council members in interview techniques. Evidence in the record of *Back v. Robinson, infra,* indicates that previous school councils at Russell High School had enlisted the superintendent to assist them in interviewing principal applicants. Since its original enactment, the statute has been amended as follows:

1  1992 Ky. Acts, ch. 376, § 3. As originally enacted, the statute required that personnel hired *by the principal* be from a list of applicants "recommended by" the superintendent, almost identical to the requirement that still exists with respect to the hiring *of a principal.* The amendment deleted the "recommended by" requirement and substituted therefor a requirement that those hired be from a list of applicants "submitted by" the superintendent. The same amendment added the language at the end of the last sentence that is at the heart of today's controversy, *i.e.,* that additional applicants be provided upon request "when qualified applicants are available."

Prior to the 1992 amendment, the Attorney General rendered an opinion pursuant to KRS 15.020 in response to an inquiry as to whether school councils were entitled to review applications of those not "recommended by" the superintendent before consulting with the principal with respect to filling non-principal vacancies. The Attorney General opined that "the council has a right to see applications and accompanying materials on applicants who have been recommended, but not on applicants who have not been recommended by the superintendent." OAG 92–131. Presumably, the issuance of OAG 92–131 is what prompted the 1992 amendment. It is noteworthy that the 1992 amendment did not change the "recommended by" language pertaining to the hiring of a new principal.

After the 1992 amendment, the Attorney General was asked to render a new opinion on the same subject previously addressed in OAG 92–131. Despite the deletion of the "recommended by" requirement, an argument was advanced (presumably by a superintendent) that addition of the language, "qualified applicants," meant applicants that met all legal requirements, *i.e.,* certification, and no disqualifying criminal record, and the recommendation of the superintendent. The Attorney General rejected that interpretation and opined that in light of the deletion of the "recommended by" language, "qualified applicants," in the context of a non-principal vacancy, means "all persons who meet all qualifications set forth by statute, regulations, *and school board policies*" (though the school board has no hiring role except to "appoint the superintendent of schools, and fix the compensation of employees," KRS 160.290(1)). OAG 95–10 (emphasis added).

The Attorney General has not rendered an opinion interpreting the meaning of "qualified applicants" in the context of a principal vacancy, which still requires that the person hired must be "recommended by" the superintendent. However, the

Department of Education, the supervising agency of our system of common schools, KRS 156.010, has consistently interpreted "qualified applicant" in that context to mean an applicant with no disqualifying criminal record, who has been certified by the Education Professional Standards Board pursuant to KRS 161.027, *and* who has been recommended by the local superintendent. *See* Kentucky Department of Education, School–Based Decision Making Statute 17 (2002) (" 'Qualified' applicants for a principal's position include proper certification, a clear criminal records check, any objective criteria established in local board policy (OAG 95–10), and the recommendation of the superintendent. If the school council reviews the entire slate of candidates received from the superintendent and still wants more applicants, the superintendent must submit the names of additional qualified, *thus, recommended* applicants if those applicants are available.") (emphasis added). *See also* Ky. Dep't of Educ., *SBDM Issue,* 6 Common Agenda: A Kentucky Department of Education Publication for School Councils 131, 132 (Jan.2000) ("an unrecommended applicant is an unqualified applicant for principal"). It is a principle of statutory construction that if, as here, there is a statutory ambiguity, *i.e.,* the meaning of "qualified," "controlling weight will be given to a long-standing interpretation given to the statute by the agency charged with its administration." *Davidson v. Am. Freightways, Inc.,* Ky., 25 S.W.3d 94, 98 (2000); *Hagan v. Farris,* Ky., 807 S.W.2d 488, 490 (1991).

2   2000 Ky. Acts, ch. 212, § 1. This amendment added the language, "consistent with subsection (2)(i)(10) of this section." Subsection (2)(i)(10) requires the school council to adopt "[p]rocedures to assist the council with consultation in the selection of personnel by the principal, including, but not limited to, meetings, timelines, *interviews,* review of written applications, and review of references." (Emphasis added to point out for purposes of the next amendment that council members are authorized to interview all applicants for school employment, not just applicants for principal.)

3   2000 Ky. Acts, ch. 527, § 14. This amendment requires that school council members be trained in interview techniques prior to interviewing applicants for principal. The majority opinion, *ante,* at 902, cites this amendment as indicating a legislative intent that applicants for principal need *not* be recommended by the superintendent; otherwise, only the superintendent would need training in interview techniques. In fact, this amendment was a small part of a comprehensive bill entitled "A[n] Act relating to the professional preparation of school personnel," that provided for continuing training and education for all school employees. *See generally* 2000 Ky. Acts, ch. 527. The records in the two cases *sub judice* indicate that school council members had been interviewing principal applicants recommended by the superintendent long before this amendment was enacted. The amendment merely requires council members to acquire some expertise in that regard.[2] Presumably, a superintendent does not need additional training in interviewing and selecting applicants to recommend for principal, having acquired that expertise while fulfilling the require-

---

**2.** If so, perhaps school council members could make their decisions on factors other than whether a candidate was "too laid back" as opposed to "good on paper" but "too aggressive."

ments for obtaining a superintendent's certification, *see* 16 KAR 3:010, or while attending the superintendent training and assessment program. *See* KRS 156.111; 704 KAR 3:406.

4 2002 Ky. Acts, ch. 152, § 1. This amendment added language permitting the superintendent to submit names of *qualified* applicants for non-principal positions who were *not yet certified* but requiring that any applicant subsequently hired present proof of *certification* pursuant to KRS 161.020 before assuming the duties of the position for which that person was hired. This amendment clarifies that there is a distinction between "qualified" and "certified" and that the General Assembly understands that distinction. The majority opinion, *ante*, at 899–901, defines "qualified" as "meeting statutory requirements." The only statutory requirements for a principal applicant, other than not being a convicted violent offender or felony sexual offender, KRS 160.380(3), is that the applicant be certified by the Education Professional Standards Board. KRS 161.020(1); KRS 161.027; 16 KAR 3:053. If "qualified" and "certified" mean the same thing, the 2002 General Assembly would not have amended KRS 160.345(2)(h) to permit the consideration of an applicant who is "qualified" though not yet "certified."

Proposed amendments of KRS 160.345(2)(h) that were introduced but not enacted, also are relevant to a proper interpretation of legislative intent, *viz:*

1998 House Bill 152, which would have amended KRS 160.345(2)(h) by deleting the requirement that the school council consider only those principal applicants "recommended by" the superintendent and substituted therefor a requirement that the superintendent merely submit a list of principal applicants to the council as is presently done with respect to vacancies in non-principal positions; and

2000 House Bill 717 and 2000 Senate Bills 46 and 76, which would have deleted the last sentence of KRS 160.345(2)(h) and substituted language that "[t]he superintendent shall initially recommend no fewer than three (3) principal candidates and shall honor all requests of the council to provide additional candidates."

The majority opinion, *ante*, at 901, invokes the horrible that a superintendent might recommend only one candidate and claim that the other applicants were not qualified, thereby "strip[ping] the school council of any actual authority." Of course, the plain language in KRS 160.345(2)(h) that the school council shall select the new principal "from among those persons" recommended by the superintendent belies this particular horrible. As correctly interpreted by the Department of Education, "from among those persons" obviously means "more than one" person. *Common Agenda, supra*, at 2. On the other hand, the majority opinion's interpretation of "qualified applicant" creates the horrible that actually occurred in *Young v. Hammond*, *i.e.*, the council's stripping the *superintendent* of statutory authority over personnel actions by unilaterally reinstating a "too laid back" applicant previously demoted by the superintendent apparently because of that very characteristic.

Admittedly, attempts to change this aspect of KERA have not been one-sided. The General Assembly has also considered and rejected three proposed amendments that would have vested superintendents with the authority to hire principals from a list of applicants recommended by school councils instead of vice versa. SB

308, 1996 Sen., Reg. Sess. (Ky.1996); SB 338, 1998 Sen., Reg. Sess. (Ky.1998); SB 264, 2000 Sen., Reg. Sess. (Ky.2000). However, despite the best lobbying efforts of the Kentucky Education Association and the Kentucky Association of School Administrators, the General Assembly has wisely maintained the system of checks and balances that requires the school council to select a new principal from applicants recommended by the person best qualified by training and experience to determine whether an applicant is qualified, and who is statutorily required to supervise, evaluate, and, if necessary, demote or terminate the person selected. Numerous reasons support the necessity of an initial screening process that demands more of applicants than the absence of a serious criminal record and fulfillment of minimum certification requirements:

> Not every person who holds administrative certification is qualified to serve as principal. There are individuals who maintain lifetime certificates who have not been inside a school in many years. There are certified individuals whose misconduct or negligent behavior, breach of professional ethics or breach of contract may be known to the superintendent but who for some reason have not been prosecuted. And there are some certified personnel who simply are not competent to be educational leaders. These circumstances may cause a superintendent not to recommend an applicant for a principalship, but they may or may not be known to the school council. If the council selects a principal whom the superintendent cannot recommend because of lack of professionalism or incompetence, it is the students who suffer.

Brief of Amicus Curiae Prichard Committee for Academic Excellence at 8. It is appropriate to add to the Prichard Committee's list those certified individuals who have managed to cultivate favoritism within the school council. As noted by the majority opinion, *ante*, at 900, favoritism in hiring was one of the evils singled out for condemnation in *Rose v. Council for Better Education, Inc.*, Ky., 790 S.W.2d 186, 193 (1989). *Back v. Robinson, infra,* provides a prime example of such favoritism; one teacher member of the school council testified that she would have preferred her "good personal friend" (Robinson) as her supervisor instead of "that doofus" (her actual supervisor).

The Prichard Committee was formed in 1983 and spearheaded education reform in Kentucky. One of its members, former Governor Bert T. Combs, served *pro bono* as lead counsel for the plaintiffs in *Rose, supra.* Molly A. Hunter, *All Eyes Forward: Public Engagement and Educational Reform in Kentucky*, 28 J.L. & Educ. 485, 489–93, 499 (1999). The Committee has consistently advocated decentralization of authority and involvement of parents and school councils in the decision-making process, even to the point of antagonizing some superintendents and school board members. *Id.* at 508. Yet, the Prichard Committee has filed an amicus brief urging us (to no avail) to reject the Court of Appeals' interpretation of "qualified applicants":

> This case has important public policy implications for Kentucky's system of public education. If allowed to stand, the decision of the Court of Appeals will adversely affect the working relationship between the school superintendent and the school council.... The Prichard Committee submits that if the council may select a candidate whom the superintendent does not recommend, the su-

perintendent's ability to supervise the district is impaired and the quality of education in the schools may ultimately suffer.

Brief of Amicus Curiae Prichard Committee for Academic Excellence at 1. That is almost exactly the same sentiment expressed by the executive director of the Kentucky Association of School Councils, quoted *supra*, *viz:* "For a school and a principal to succeed, there must be a strong commitment from the central office. They work together." Cooper, *supra*, at 1C.

I find no evidence of any legislative intent consistent with the majority opinion's interpretation of KRS 160.345(2)(h). In fact, all evidence of legislative intent runs contrary to it. Today's majority opinion will only promote more favoritism among school employees to the detriment of the educational process. Few principals would dare discipline or correct the very teachers in whose hands their employment might someday rest. Principals now know that if demoted or terminated by the superintendent, they can be rehired by their own teachers, and will be tempted to curry favor in anticipation of that occurrence. Thus, being "too laid back" has the dual advantages of (1) minimizing the principal's supervisory obligations while (2) increasing the principal's job security. Unfortunately, it also promotes incompetence and inefficiency in our system of public schools to the detriment of the students, precisely what *Rose* and KERA intended to eliminate.

Accordingly, I dissent in *Young v. Hammond* and would reverse the Court of Appeals and remand this case to the Adair Circuit Court with directions to dissolve the temporary injunction and dismiss the civil actions filed by Akin and the individual members of the school council.

## III. *BACK v. ROBINSON.*

Mary Robinson was the assistant principal of Russell High School when a principal vacancy occurred in the spring of 1996. Robinson possesses a principal's certification and applied for the vacant position. The superintendent, Ronald Back, furnished the school council with the applications of those applicants that he recommended for the position, which did not include Robinson's application. The record does not reflect whether any other female applicants were recommended. The council did not request additional applications and chose a male applicant for the job. The vacancy recurred in the spring of 1997 and Robinson again applied for the position. Again, Back did not include Robinson among his recommended applicants to the school council. This time, the council requested additional applications and Back's response, like Adair County superintendent Young's, was that there were no other applicants that he would recommend. The council then selected one of the recommended applicants, another male, and that person was hired.

Robinson filed suit in the Greenup Circuit Court against the Russell Independent School District and against "Ronald Back, in his official capacity as Superintendent of Russell Independent Schools." She claimed Back violated KRS 160.345(2)(h) because she was a "qualified applicant" whose application was not provided to the school council when it requested additional applications. For this claim, Robinson demands that the 1997 hiring of the new principal be set aside and that the hiring process be reopened so that the council can consider her application. The majority opinion's interpretation of "qualified applicant" mandates that result. It should be noted that, unlike the Adair County

school council, the members of Russell school council have not expressed any fixed determination to hire Robinson. They did not specifically request that her application be provided and, in a letter to Robinson dated July 18, 1998, informed her only that if her application had been provided, "you would have been given the same consideration that the other candidates were given for selection." Because I disagree with the majority opinion's interpretation of KRS 160.345(2)(h) for the reasons stated in my review of *Young v. Hammond, supra,* I also dissent from the majority's decision requiring removal of the present principal of Russell High School and the reopening of the 1997 hiring process.

Robinson's second claim is for damages for gender discrimination proscribed by the Kentucky Civil Rights Act. KRS 344.040(2); KRS 344.450. The Russell Board of Education is an agency of state government entitled to governmental immunity. *Yanero v. Davis,* Ky., 65 S.W.3d 510, 527 (2001). Since Back was sued only in his official capacity and not in his individual capacity,[3] he enjoys the same immunity as the Board. *Schwindel v. Meade County,* Ky., 113 S.W.3d 159, 169 (2003). Obviously, the hiring of a school principal is a governmental function, not a proprietary one, and immunity applies unless waiver is found "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Withers v. Univ. of Ky.,* Ky., 939 S.W.2d 340, 346 (1997) (quotation omitted). For the reasons expressed in my dissenting opinion in *Department of Corrections v.*

*Furr,* Ky., 23 S.W.3d 615, 618 (2000), I conclude that the General Assembly has not waived a governmental agency's immunity from suit under the Kentucky Civil Rights Act. Thus, I also dissent from the majority opinion's holding that Robinson can proceed with her gender discrimination claims against Back and the school board.

Robinson's third claim was that the Russell Board of Education owed her money for overtime that she worked in the summer of 1996 at the verbal request of a former principal. Both the Greenup Circuit Court and the Court of Appeals ruled against her on this claim and she filed no cross-motion for discretionary review. CR 76.21. Thus, that claim is abandoned. *Commonwealth Transp. Cabinet, Dep't of Highways v. Taub,* Ky., 766 S.W.2d 49, 51–52 (1988).

Accordingly, I dissent in *Back v. Robinson* and would reverse the Court of Appeals and reinstate the summary judgment entered by the Greenup Circuit Court.

KELLER, J., joins this dissenting opinion.

---

**3.** It is unnecessary to determine whether Back could have been sued in his individual capacity. *See Lococo v. Barger,* 958 F.Supp. 290, 294–95 (E.D.Ky.1997), *rev'd on other grounds by Lococo v. Barger,* 234 F.3d 1268 (table) (6th Cir.2000), 2000 WL 1679484.